Good morning. May he please the court. I am Candice Pimentel-Soto. I am the attorney for the United States v. Ivan M. Falcon-Nieves. At this time, would Attorney Pimentel-Soto please come to the podium and introduce herself on the record to begin? Good morning. May he please the court. I am Candice Pimentel-Soto and I represent Appellant Ms. Marielis Falcon-Nieves. Your Honor, may I reserve one minute for rebuttal? You may. I will refer to my client as Marielis at all parties did in the brief. If the court allows me, I will address the Rule 29 error. If I say I will charge you a fee to expedite your payments. And if you don't pay me, your payments will not be expedited. That is not extortion. The most the government was able to prove in this case was that Marielis' conduct fell under that scenario. She was paid by Ramon Crespo to help expedite payments from the Puerto Rico, Ecuador, and Suez Authority, PRASA, which she in fact did. He wanted to get paid sooner than later and he got it. There was no possible loss of any particular economic right involved in this case as the element of the offense of extortion requires. Because getting paid sooner than later is not an economic right. Crespo was not entitled to claim expedited payments from PRASA. It was a privilege, a benefit, and a advantage that he obtained. You agree though that we don't look only at what the actual thing that was done was. We can also look at the words of your client that were said to Crespo, correct? That's right, Josh. And doesn't the record show, I forget the exact wording, at one point something like you see how we do things? And why wouldn't in the whole context of the interactions between them that not reasonably be understood to the point that the person saying that should know the kind of fear that could induce that that might suggest if you don't pay up we also won't even provide them in the ordinary course? Right, Josh. Well, first of all, I don't know that. I'm focusing on what the record does show and I want you to address those words and why those words aren't ambiguous enough. If you say your money or your life, that's extortion, right? But typically persons who are extorting don't say that. But they can say other things that can give off that same impression. And if they do, couldn't a juror then find, well, I think that's close enough. So the actual words that concern me are those words which are, I think they're something like you see how we do things or something like that, right? Yes, Your Honor. Well, according to Crespo's testimony, Marielle told him in a second instance after a call she made in his presence was that he said, as a friend, you see how we do, and I quote, this. And we charge 5 to 10 percent for this. And what is important is what went through Crespo's mind. And we don't have to speculate because he testified as to what he had in his mind when he heard Marielle saying those words. And he said that he understood she was referring, and I quote from the record, to expedite payments of the checks. And he also said that that is why, and I quote, he paid her. So when he heard Marielle saying that, he didn't understand that she was charging him for anything else than to expedite payments. So had not Crespo agreed to that, had not Crespo paid her, all that he would be risking was expediting the payments. And what is your explanation of what we are to make of his testimony that he did fear economic harm in the sense of having payments not provided at all or substantially delayed beyond the delay that was already happening? Because he saw once she had the power to do X, it was reasonable for him to think she also had the power to harm him beyond just providing the benefit. Well, first of all, that statement from Crespo came after him becoming a government witness and not being charged. I understand, but Ron's sufficiency, so the jury certainly could credit it. So, Judge, I submit to the court that Crespo's statement shows that he was not a reasonable fear, that all the circumstances according to his testimony could have not led the reasonable jury to believe that he was reasonable. Crespo said that she made a call, for instance, and in his presence and according to his testimony, when she made that call, she said in the call, I know Crespo, I know Ramon, I know his parents. And later on the call, she said, and this was his testimony, later on the call, she asked, that was the verb he used, if his check could be issued. So the context of the call, according to Crespo's testimony, was kind of asking for a favor, for a friend, and not actually any show of threat or any show of power. She didn't demand the payment. She didn't show any authority during that call. So there was no basis for Crespo to believe that, nothing on the record, for him to reasonably believe that she would stop the payment. One last question. There's a period where, to sort of test things out, he stops making the payments to her. And it's in that period of time no payment is made to him. Is there anything in the record that tells us whether the period in which he didn't get the payments, after not making the payments to your client, that indicated a delay beyond the delay one would have expected based on what the record shows about how delayed all the payments to him were? Does that make sense as a question? Yes, it absolutely makes sense, and I will address that. Josh, there's nothing on the record showing that there was ever a delay in payments to Crespo. There was only one single instance that he testified that he didn't pay the full amount you requested, and he claims that he didn't receive payment during the 30-day period. However, Government Exhibit 407, which I attached to my reply brief, and also a table, an illustrative table that I prepared and was attached to the reply brief, shows that never, never in 2012, there was 30 days where Crespo did not receive a check from Prasa. That never happened. In fact, Your Honor, his testimony, and at the very least two other witnesses testified from the government, Alcina and Acosta, that Crespo was always paid regularly and in advance of the due date in 2012 and 2013. Additionally, he told the jury that the norm was that he was paid 60 days after submitting the invoice. But more importantly, Your Honor, the Government Exhibit 407 shows if one compares the columns of date when he submitted the payments, and one compares, there's a column showing the date when the check was issued. There was no 30-day period between one payment and another payment, never. Any further questions? Thank you. Thank you. At this time, Mr. Weinberg, please introduce yourself on the record to begin. Good morning, Your Honors. Martin Weinberg on behalf of Yvonne Falcone, and I would ask to reserve two minutes for rebuttal. You may. First and briefly, I want to separate out the extortion allegations that made Yvonne Falcone a co-defendant of her sisters, and I will refer to her as Yvonne, if I may, just to distinguish between the two Falcones. She was not present at any conversation between her sister and Mr. Crespo. There's no evidence that her sister informed her of the content of any communications that she had with Mr. Crespo. She had none of her own conversations with Mr. Crespo, and there's simply an inadequate basis to circumstantially infer that she had either the knowledge or the willfulness, certainly not to be a principal in an alleged extortion, and I contend not to share any illegal purpose not to be an aider and a better, and I would respectfully ask that the court vacate the extortion conviction. The government has suggested that there were deposits made into Yvonne's bank account about the same time as evidence of payments to her sister. What do you ask us to make of that? Should we consider that in terms of the extortion charge? I don't think there's a tight enough nexus to establish that the source of that currency was her sister or was Mr. Crespo to her sister. There were other explanations involving her mother's Falcone Ambulance Company, and the funds independent of her mother's Falcone Ambulance Funds were very small, and they were not isolated to the year 2012 and into early 2013. So I don't think that saves the government's proof, given the gaps of knowledge. And in particular, the one conversation the government claims she had with her sister that Mr. Crespo heard was with someone named Bonzi. Let's infer for a second that it may have been Yvonne. At the conclusion of that conversation, the only one that was proven to be between her sister and Yvonne, Mr. Crespo said that he thought that the sister, Mariellis, was doing a favor for him. So based on the words of that conversation, it was not apparent to Mr. Crespo that there was any illegality or any threat or any pressure of economic harm. And certainly you cannot infer that his sister, who never spoke to Crespo, could possibly have had the knowledge that would have been the predicate for an extortion conviction. I'd now like to switch to the other counts, the 1346 and the 666 counts, and contend that this is a case that's similar to the one in the language of United States v. Tavares, a decision that was written by Judge Turea, joined in by the court. The words that did not all unappealing political conduct falls within the ambit of the federal criminal statutes. Let me do it this way and you tell me if this is, at least as to what's going on, an accurate account of what's happening. As I understand it, that conspiracy count has three different parts, A, B, and C, of which only one is the honest services fraud aspect of it. You make a contention that the bribery, the two bribery portions of it, fall out for reasons that have to do with a lack of federal funds supporting them, correct? Yes, in part. Okay. So if we were to agree with you on that point, the sufficiency of the conspiracy count could still survive if one A survives, correct? Yes. Even though the government's conceded it has to be vacated, it still could survive just as a smaller, even if all that was proved was a subset of the conspiracy charge in one A, isn't that right? Yes, Your Honor. This is more of a Griffin than a Yates analysis. So with respect to the one A part, how much of the conduct is relevant to one A? In other words, what's on the table with respect to one A? I can't tell from the face of the count, and I honestly couldn't quite tell from the briefing, what relates to one A. I think, and you tell me if this is right, the three column issue relates to one A. So if there's sufficient evidence of that, then count one survives. Yes, Your Honor. Okay. The job fair conduct also could be a basis for surviving on one A, correct, for the count surviving? Yes, Your Honor. Okay. Is there anything else that the parties understand, you understand, that is the conduct that could be a predicate for one A beyond the job fair and three column evidence? Not whether on the merits there's sufficient evidence of it, but just even as in the, in play for that one A part. Well, I mean, the government, I think, would contend that the links contract and the relationship between Sally Lopez Martinez and ADL and the AAA would be for one A. Now, what do we do with the fact that I didn't understand there to be a wire identified with respect to either of those two things? And there's no wire that was specifically alleged in the substantive counts. But you don't make an argument, I'm trying to understand from your point, there's nothing in your briefing saying that because of the I'm sorry, Your Honor, because we were talking about an allegation that centered on the government's case, which was a promise So for purpose of this appeal, if the ADA links contract evidence suffices, if the three column evidence suffices, if the job fair conduct suffices, or if, and what's the fourth, the IACM evidence suffices, if any of those four are supported by sufficient evidence, then the conspiracy count survives on your view. We would contend, Your Honor, that there's gaping holes. I understand that. I want to get to that in a second, but I just want to understand what I'm supposed to be thinking. But you don't disagree that if any of those four is supported by sufficient evidence, count one survives? Yes, Your Honor. Okay. So may I quickly address these four premises? Yes. You know, the three column, the most distinct evidence that Yvonne was not a conspirator who made I'm sorry, just one last question. Is that true, even if the federal funds portion of the two bribery counts render them insufficient as substantive counts? In other words, for the conspiracy count, are you making an argument that there can't have been a conspiracy to commit those if the federal funds portion is not proved of the, maybe it's not a conspiracy to commit those. Yes, Your Honor, because I think the predicate No, the predicate for a 666 would have to be proof of the $10,000. Right, but for honest services fraud, you don't have to have that. You don't have to have that. So is the conduct alleged in the counts concerning the program bribery conduct, which I understand to be the ADA links contract and the IACM payments? Is that right? Yes. I can't tell from your briefing, but it seemed as if you were accepting that that conduct, even if the federal funds portion of it wasn't proved, could nonetheless support the honest services component. In other words, 1A of the conspiracy charge. Is that right or wrong? If there was a proof of a scheme to defraud and the skilling type bribery, the exchange, in this case, because it was an as opportunity Even if there wasn't evidence of federal funds? Yeah, had they not charged 666, they could charge a conspiracy. Okay, so we still have to consider that conduct with respect to 1A for the sufficiency challenge. Yes, Your Honor. And as to that, the key is, because it's an as opportunities arise or stream of benefits, it's not a this or that, that the government has to prove more than some open-ended opportunities arise. It has to prove a promise, a commitment made by Yvonne at the start of the stream of benefits or whenever they allege an as opportunities arose theory of prosecutorial liability. When you look at, as Judge Howard said in the McDonough case, you look at the acts to infer the nature of a promise. It's the strongest evidence of a promise. When it comes to 3Com, for instance, what Yvonne Falcone did in terms of the McDonough test that you need to look to whether or not a public official made a commitment for an act or a decision in relation to a concrete issue or matter. Signing contracts, agreeing to contracts would be a McDonough type issue, like a legislative vote for a legislator, an administrative agency determination. Well, so the payment of the IACM payments, that would be an official act. I would contend that wasn't within the ambit of the original promise, because that was an outlier. It came afterwards. The key for Mr. Hernandez, who, by the way, his direct testimony, and I think it's important when you're weighing inferences in a circumstantial case, incriminating versus innocent. Mr. Hernandez said Yvonne always conducted herself in an honest manner. That's a government witness seeking a 5K that they put on the stand as the cornerstone of this broad conspiratorial allegations. That matters. What else matters in 3Com is when, despite attending meetings, providing access, when it came time to a contract, and this was the key contract, a major contract lucrative to Hernandez that Hernandez was advocating for very vigorously with AAA, Yvonne Falcone relinquished authority to an independent IT director who thereafter... Consider the contract, but that's not a decision or an action. He was not pressured. He decided instead to... There's a question about whether it's an official act, consideration of a contract, and then there's a question of whether, with respect to the requirement to consider it, that was motivated by the payments. But as to the first question, are you saying that even if I order you to consider a contract, the consideration of it is not itself an official act? Yes. It's a preliminary. It's not akin to an exercise of formal government of power, which is what McDonnell requires. So is an official orders a subordinate to consider their child's application or a donor's child's application? That's not an official act? Not when there's not pressure to authorize... What's your best authority for that? Just McDonnell itself? Yes. McDonnell itself talks about the need for a pending matter. And so I think that when you look at balancing inferences, the idea that she relinquished authority to approve a contract for Hernandez and instead supported the decision to reject Hernandez's company and instead to have Mr. Santabria select another company is inconsistent with her having promised Mr. Hernandez contracts. And very briefly, with Lynx, and it's very distinct from the Sally Lopez Martinez evidence, Yvonne was not the head of the agency. She didn't enter the Lynx contract. Her superior, Mr. Lazarus, did with HR people who were in the line of authority at the time of May 2013 with Mr. Lazarus. Any questions from my colleagues? Thank you. At this time, if Mr. Henwood would introduce himself on the record to begin. Good morning, Your Honors. Timothy Henwood on behalf of the government. Your Honors, if I can begin with the extortion counts. The government submits that Marios Falcón established a fear in Mr. Crespo, which was a reasonable fear. At their first re-encounter that they had at a restaurant in Caguas, Puerto Rico. It was the first time that they'd seen each other in years. And during that conversation, Mr. Crespo indicates that what he's doing is he's a contractor for AAA. And during their conversation, this is an important fact, Marios Falcón indicates that her sister, Yvonne Falcón, who Mr. Crespo knew, is the person in charge of the payments at AAA. And her position in AAA really was something that was at the heart of this count. She was the person authorizing the checks for AAA. And they were the checks that were at issue in this case. And in our position, Your Honors, is that Mariales sensed this opportunity, exploited this opportunity. What in the record indicates that she was doing more than saying, I'll give you a benefit? Well, the testimony of Mr. Crespo. Well, he certainly says that he feared it just because anybody who's in a position to give you a benefit also is in a position to pose a burden. Is the government's position that that's enough? Our position is... There is other evidence. And I think when they're reestablishing that relationship, something very important happens when she makes the call to get the first check out. What happened is during their first re-encounter, there was a conversation about Mariales having some apartments and she had some large trees that she wanted to have removed. And so Mr. Crespo said he would take care of that. What he did was he had some people that he subcontracted. He wasn't planning on making any money from that, but he hired these folks and he got the equipment. And the work was done. It took about a week and a half for the work. And he was going to bill her for that work. And it was approximately $2,500 worth of work. And at the time when the work is done, when he's going to reach for the invoice and take the invoice out and present it to her for payment, that's when she asks him and she seizes on the opportunity and exploits where he is financially. And she says how much money is owed to you. And that's when he says it wasn't much at the time. I believe it was around $20,000. And she makes the call that was discussed earlier to someone who was identified as Bonsey. And at the end of that call, she tells him. But if you're saying the extortion then occurred at that moment? Well, the rest of that encounter is the following, Your Honor. When he's going to reach for the invoice where he's owed and his workers are owed $2,500, she tells him. I understand that. But you're saying the extortion occurred, the fear that was imposed on him was the fear of not getting paid for his contracting work for her? Well, that was the beginning of it, Your Honor, and it continues throughout. Because that's going to make it hard to show Yvonne was an aider and a better of that. I think there's additional evidence regarding Yvonne. No, no, but you have to isolate. What is the instance that the government is saying is the instance at which the economic fear was being exploited? If it's at the moment in which he was owing her for the contract, is that the moment? No, Your Honor. I thought from your briefing the point was it was because he might not get the IACM payments. Right. And so what is the evidence indicating that she was exploiting economic fear with respect to that? With respect to the money he was owed by AAA, that the evidence would be the call. And as soon as he tries to present the invoice, she says, no, you're not going to take that. So essentially he has donated that work. And so that was $2,500 that he had to pay. And he thinks and he testifies at that point, he says, I knew I was screwed because if someone has the power to issue a check in five minutes, they also have the power to stop the payments. And that's where we go back to two points with regard to Miss Yvonne Falcone. And one being that Mariellis tells her in that first encounter. And it's not a situation where she says, my sister works in AAA. My sister knows somebody in AAA. And this was important in our opinion for the jury's determination. It was my sister is in charge of payments at AAA. She was the treasurer of AAA at the time, the person issuing the check. So this isn't and we would submit it's a reasonable fear for Mr. Crespo because of that position and the circumstances that occurred. I get this theory. If I'm understanding you right. Does this require us to infer for purposes of the Yvonne extortion count that Yvonne was aware that Crespo's contracting work would not be paid for unless he made payments in order to get the IACM payments? No, Your Honor. So then let's put that aside. Is there a theory of extortion involving Mariellis that the government is proposing that Yvonne could be an aider and a better of? And what is that theory and what's the evidence that supports it? So the theory would be, Your Honor, one is her position in AAA. But then there's also testimony from Lourdes Alcina, who was an employee of AAA. And she testified that during that time period in 2012, and she thought this was highly unusual. She was contacted by Ms. Yvonne Falcone regarding the payments of IMEC. And she testified that that was unusual and advancing those payments violated an internal rule at AAA. And it, which did not allow for advanced payments because of the negative impact on cash flow. So in her mind, the jury heard that. Now that's explaining how she did something that could make her an aider and a better if there's extortion that she was aware of. So then we get to the question of where is the evidence of the economic fear being imposed on Crespo of which one could infer that Yvonne was aware of. If it's not, as I think you just said, it's not the evidence relating to Mariella saying, I won't pay you the contracting work unless you pay. Right. It would be circumstantial evidence that the jury heard regarding the unusual interest that Yvonne. But that just shows her involvement doesn't show that she was aware that economic fear was being imposed rather than just a benefit given to him. But that would be it. That was that was the evidence, your honor. And we ask for that inference. There's there's nothing beyond that. No, your honor. What about the statement? This is how we do things. So that's that's the statement from Marielle. Your honor. Yes. And our position would be that that is. And when's that when's that made that statement? That statement was made. Not at the first encounter, but shortly thereafter, when when the amount of money that was going to be paid due to him getting a check, going to cash the check and giving her cash. And so the nature of those transactions also, in our opinion, support the extortion because she's getting paid in a parking lot of a bank in cash. And that's when that that statement is made. And then there are a couple of cases that that were cited in the brief. And one is the Garcia case. And the other is the case. And we, in our opinion, those cases are both distinguishable in from the situation at hand in the case, which was a job selling scheme at Kodak. It was sort of a pay for pay for play kickback scheme where you would get referrals for people to be hired at Kodak. And if you referred someone and they actually got hired, you would give them five hundred dollars, six hundred dollars. And based on those relationships, the government charged extortion against what the Mr. Capone, who was the principal defendant in the case, was a barber who was referring people to Kodak to get hired. And the court there. This was not extortion because there was nothing that these people were entitled to. They had no real other than hoping to get a job at Kodak. They didn't have anything that they were already entitled to. That's distinguishable from Mr. Crespo. Mr. Crespo had a contract with AAA. He had performed the work under AAA. He was entitled to receive payment. Doesn't the record show in the ordinary course it was going to be delayed anyway? Is there anything to show other than that? Or put otherwise, is there anything in the record that shows that the payment was delayed beyond what in the absence of any payment it would have been delayed? The testimony of Mr. Crespo was that at one point after speaking with his partner who was involved in this and telling him what was going on, they decided to not pay a full amount. I believe they paid two thousand five hundred dollars instead. And then nothing was paid during that period. He says for approximately a month. Is there anything in the record that shows that that period of nonpayment is longer than the ordinary period of nonpayment given the general delays for all payments of this type? I don't believe he was able to specifically pinpoint that. And I also don't specifically believe he was able to pinpoint exactly when it was that he withheld those payments. You want to turn to the other count? Sure. Yes, Your Honor. With regard to Ms. Yvonne Falcone, the government submits that she did take official acts in her position in receipt of a stream of benefits. Before you do this, can I do the same thing that I did with your opposing counsel? Because it will help me understand what's happening. I understand now that for the 1A, honest services fraud, your opponent says that survives so long as there's any evidence with respect to any of the four. Right. We're in agreement with that, Your Honor. With respect to 7, 8, and I take it that's the same with 6. Right. With respect to unless 6 doesn't include certain of the conduct because of the narrower class of individuals involved. I can't remember on that. With respect to 7, 8, and 9, the way I read the charging document, it describes the scheme as the scheme described in the conspiracy count, count 1, and doesn't say more than that. That would suggest the scheme is the overarching scheme, so everything that falls within 1 also falls within 7, 8, and 9. Right? Yes, Your Honor. Okay. Is there any, I take it the government's position, and I don't understand defendant to have argued otherwise, that there's a problem with proving a subset of that as long as you can prove a subset of it. Just like with respect to a conspiracy, that might give rise to a variant, so maybe you have to vacate it, but the government's conceding you vacate it anyway. So for sufficiency purposes, you can prove any of the conduct 7, 8, and 9 covers? Yes, Your Honor. That's good enough, right? Yes, Your Honor. Okay. That means for 7, 8, and 9, all four of the things that are on the table for 1A are also on the table for 7, 8, and 9, notwithstanding that 8 and 9 talk about a wire that relates only to the job fair? Well, Your Honor, so with regard to 8 and 9 in the job fair, our position would be that, I guess we would limit 8 and 9 to the job fair. You are limiting 8 and 9 to the job fair? Yes, Your Honor. Okay, and then 7 is limited only to the 3Com? Because that's the only wire there that's relevant? Is that right? That's correct, Judge. Okay, so the government's position is that 7, we look only at 3Com, 8 and 9, we look only at the job fair evidence. And the wires were tied to those specific, for the substantive counts, yes. For those 3 substantive counts. Not for the conspiracy counts. Okay, that's very helpful. I appreciate that. Okay, well with that in mind, if you can go through 1 and then 7, 8, and 9. So, with regard to count 1, which would be the proof of the conspiracy, Yvonne Falcone, with regard to the various projects that we've mentioned, 3Com Global, the links, the IMEC payments, and the job fairs. Let me do this way. Let's start with the job fair. What is the evidence of Falcone doing anything other than having received an email? I believe the testimony from Anouti Hernandez was that she, that AAA provided for the job fairs a booth and water, and I believe he had discussed that with her at the job fair, regarding the job fairs, in support of the job fairs. In the job fairs you needed different employers who could send people to talk about potentially getting work for people in Puerto Rico. Is there evidence that she did attend? That she attended? No, that AAA took part in the job fairs by sending a booth and water. There is evidence of that? Yes, Your Honor. And the idea is that she received an email requesting that, then they did provide the booth, and so the inference is that she did it in response to the email? And the conversations and meetings that she was having with Anouti Hernandez. That's correct. So her official acts are sending the booth and the water? So her official acts with regard to that would be making the decision to support that. Yes, Your Honor. And that's a point that is one, and we distinguish this case from Sally Lopez. I'm sorry, just one. What did he get out of having the run the job fair? They ran the job fair. It was quite a lucrative contract. But her, in terms of Ms. Falcone's, what her official acts were, unlike Sally Lopez, who was the head of the agency, it was a much more straightforward case because she was signing the contracts. That was not what Ms. Yvonne Falcone was doing. However, the government, upon reading sort of the theory of Appellant in the case, has a hard time understanding what official act Yvonne Falcone can take in her positions. But if you take a look at the record and the things that she was doing, she was meeting with Hernandez to discuss specific proposals, not just support us. There were specific proposals that AAA was looking for. She would have meetings to discuss not only potential proposals, but also pending proposals. She would exchange emails with the various co-conspirators regarding the emails back and forth. But I didn't understand the government saying any of those are the official acts? Yes, Your Honor. The meeting is an official act? Unlike in... Is there anything that's an official act besides the meeting? I thought you said sending the booth is an official act. Yes, Your Honor, that would be... Is there evidence that she was in a position to be the one to send the booth? I don't know, Your Honor. I would have to take a look. Honestly, I can't answer that right now, but I think her conversations with Anati Hernandez resulted in the booth being sent. But I'm not going to say that we have the... I can't remember that there is testimony of her giving an order to send the booth. But there are, for example, she sends an email with regard to the portal where she is instructing a subordinate who she supervises to take into consideration certain information. This is now the 3Com, not the... Right, the 3Com. And so she would send... She sent an email giving instructions and the case law, Your Honor, is that an official can take an official act if she uses her position to exert pressure on another official to perform an official act or, and this is the important part, by using her official position to provide advice, intending that advice to form the basis of official act by the other official. So in her sending a proposal or saying in emails... If that's true, and I guess two questions on that. One is, what is the indication that in doing that she was doing anything irregular? I understand that, but just a coincidence of timing is enough. We've never so-held. Maybe we should so-hold, and I know you make that argument. If we were not inclined to so-hold, is there anything here, as in Lopez's case, that suggests in doing that she was doing anything irregular? If the answer is no, that's fine. I understand you have another argument, but I'm just curious. I believe we would argue to that as we did in Lopez the favoritism. What's the evidence that shows favoritism here? Is there a comparator? Is there some indication that no one else was treated this way? So I get the comparator calling someone else to say, did you receive this information? No, there's not that. We would argue that her strong favoring of Hernandez and his people would be the evidence of that, giving them the information beforehand, and then really pushing it. Thank you, Your Honors. Before you sit down, I did want to ask you about the federal fund. So yeah, Judge, this case, unfortunately, was tried three years prior to Martinez, and the evidence we adduced regarding the 666 jurisdictional element was that they received federal funds in excess of $10,000, which clearly in light of Martinez is wrong. However, when you look at the record as a whole, there is this agreement with WEA funds, Workforce Investment Act funds, which the government submits are federal benefits. Is there anything in the record showing that those actual funds made it to AAA? Yes, Your Honor. There is testimony from Heidi Rosado, who worked for Sally Lopez at ADL, and she testifies, I believe, about handling in ADL that links contract and trying to get the funds to AAA, and what in some substance she says was a nightmare because of the gaps, and eventually that contract in June, I believe, of 2013 gets canceled, but it is, I believe... Does she ever say the funds were transferred? Transferred from ADL to AAA? I don't know if she says it like that, but... Thank you. Thank you. At this time, would Attorney Pimentel-Soto please reintroduce herself on the record? She has a one-minute rebuttal. Yes, this is Attorney Pimentel-Soto on behalf of Marielle's. Your Honor, I would like to address, first of all, the first encounter that Marielle had was Prespo, and she asked him how he was doing in his business. He said, well, you know, sometimes I get paid quicker, sometimes it takes longer. That was the information that she received from him when she told him that her sister was the one who paid in Prespo. Now, there is no idea that he had any money concern in that statement. He did testify during trial that he needed those payments to pay his suppliers and to pay his employees, but never during trial did he testify that she was aware that he had any money concern and that he needed the pay to be paid properly from Prespo. Can you suggest that initial interaction in which the government is saying it would be reasonable to understand, if you're Prespo, that I'm not going to get paid for my contracting work unless I make a payment? That's right, Judge. That sounds like straight up extortion. Is that not? I don't believe so, Your Honor, since what he's expressing is a preference of being paid sooner than later. But she's got over him the fact that he's just done labor for her that she's not going to pay him for unless he makes a payment. Well, that was a subsequent encounter when he came to get her an invoice for some work he had done for her. And in that encounter, she told him that his check, that's when she made the call and said, you know, we're square off. And it's important how he describes what he understood from her conduct. And he said, and I quote from the record, she had done the favor for me. She had done the favor for me. That's how he describes it. And then he said, I understood. I couldn't invoice the work because she has done the favor for me. So I don't believe that encounter, that exchange could have led the jury to believe, a reasonable jury to believe that she was actually demanding to be paid for him to get paid, but that he believed she was doing a favor to expedite the payment. Thank you. Thank you. At this time, would Attorney Weinberg please introduce himself on the record? Thank you, Your Honor. I'm Attorney Weinberg for Yvonne Falcone. In terms of the courts questioned about the $10,000 and the 666 counts, there's evidence from a witness, Rodriguez Melendez, that the contract was canceled before any funds were paid by anyone, you know, for the job training, in contrast to the testimony cited by my brother. Second, in terms of the extortion, Yvonne Falcone, the alleged extortion, Falcone was not there with the conversation between Mary Aless and Grespo about my sister does this or that. Third, big picture is that things like the job fair or the email about the McKinsey report, the substantive acts, you know, are simply not part of the promise or commitment, the nexus that's critical when the government theory is as opportunities arise. The court's instructions below and McDonald... Why? Why couldn't a jury infer it was? Because the court needs to circumstantially infer what the nature of the promise is. It needs to be an exchange of official acts for benefits. Benefits for contracts for Hernandez, of which the running of the job fair would be one. There's a bunch of benefits going her way. And then she does something. If the record shows she did something, but then she does something to facilitate him being able to get the benefit of the job fair contract. Well, your first, this court has not yet dealt with the silver issue, which is whether or not... Put aside the silver for a second. Then I would contend, Your Honor, that you need to go back to March and April when these very stream of very modest benefits, other than meals, paying for meals at dinner, there was a pen and there was an invitation from the governor to come to an event that turned out to be Hernandez's party. It's very different from the Sally Lopez... Okay. No, I understand. But I just want to understand the argument that you're making. So let's just take it in pieces. Is there an official act? The claim is sending the booth over is the official act. That seems like it is an official act, isn't it? If there was proof beyond a reasonable doubt that Yvonne Falcone both made a determination to go to the job fair in response to the email, which I contend there was not. And second, that it was Hernandez that was made at the start of an alleged promise for opportunities. It's more than just an official act in isolation and a pen or an invitation... So you think it's each particular contract had to been identified at the beginning? I think there needed to be a commitment... Do you think each particular contract had to be identified at the beginning? Yes, I do. Or at least the contracts that were pending at the time that were concrete and discussed. And there again I contend that her actions are more consistent with innocence, her relinquishment... So if they agreed at the beginning, look, I'm going to give you some payments. He says, I'll give you payments, you give me contracts. Then that's not enough? When they then go on and have a contract because they didn't specify what it would be? It certainly would be enough if it was a technology contract that was under discussion when the alleged agreement was reached. It would certainly be enough if it was pending at the time. But the job fares is an outlier, just like the CRESPA was an outlier. And there's simply an inadequate basis to say that was within the ambit of a promise. But mostly I would contend, Your Honor, that when you go to the equipoise rule and weigh inferences from purely circumstantial evidence, again in the context of government witness, Yvonne was straight, she was honest. Everything she did was in the interest of her agency, that there simply is not enough inculpatory evidence, not enough benefits, not enough proof of contracts. Further from either of my colleagues? Thank you. That concludes argument in this case. Counsel for this case is excused. Thank you.